**Electronically Filed
Supreme Court
SCWC-18-0000010
13-DEC-2019
08:05 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

IN THE INTEREST OF AB

SCWC-18-0000010

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-18-0000010; FC-S NO. 15-0007)

DECEMBER 13, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.  INTRODUCTION

This case requires us to address the proper consideration and weight of a hānai[1] relationship in the context of a child welfare proceeding.  We conclude that a hānai relative

---

[1]  "Meaning 'to feed' or 'to nourish,' hānai refers to a child who is reared, educated, and loved by someone other than the child's natural parents." Native Hawaiian Law: A Treatise 1140 (Melody Kapilialoha MacKenzie with Susan K. Serrano, D. Kapua'ala Sproat, eds., 2015) (citation omitted).

who is a child's resource caregiver has an interest in that child's custody sufficient to allow intervention in such proceedings under Rule 24(a)(2) of the Hawaiʻi Family Court Rules (HFCR). In addition, we conclude that, when conducting a best interest of the child analysis, family courts must consider that child's hānai relationships.

The case involves a 7-year-old child, AB, who is now 12. After a short time in foster care, AB reunified with her father and lived in a home with him, his longtime girlfriend, KL, and their child, AB's younger half-sister. AB's father moved out a few months later, but AB, as keiki hānai[2] of KL, remained in the same home with her. AB lived there for over a year until the family court changed her placement to her maternal great-aunt and -uncle's home in New Hampshire.

At the hearing changing AB's placement, KL unsuccessfully urged the family court to recognize her interest in the proceeding.[3] KL appealed, and the ICA vacated the family court's order denying intervention, holding that because KL had filed a petition to adopt AB, she had a sufficient interest in AB's custody or visitation to intervene as a matter of right. KL filed an application for certiorari seeking this court's further review. She argues that, in addition to her pending adoption petition, her status as a hānai relative conferred a substantive

---

[2] As discussed further below, KL's hānai status is undisputed.

[3] The Honorable Darien W.L. Ching Nagata presided.

interest in AB's placement.

We accepted certiorari to clarify that the family court should have allowed KL to intervene during AB's placement hearing based in part on her status as AB's hānai parent.  The family court committed an additional error when it failed to examine AB's best interests prior to changing her placement to New Hampshire.  And, as part of the best interests analysis, the family court should have considered AB's hānai relationships.

## II.  BACKGROUND

AB was born to her mother, SH ("Mother"), and her father, JB ("Father"), on September 21, 2007.  Mother and Father were never married.  AB has two younger maternal half-siblings, PD and Baby,[4] from Mother's other relationships.  Mother is originally from New Hampshire and has a large extended family there, including her aunt, SH.  Father is from Hawai'i and has Native Hawaiian ancestry.  Father began a relationship with the petitioner, KL, who also has Native Hawaiian ancestry, when AB was around three years old.  The parties agree that KL is AB's hānai relative.[5]

---

[4]    Baby was placed in a separate resource home, and was adopted by his foster family.

[5]    Because KL's hānai status is undisputed, we need not determine exactly what relationships will be recognized as hānai in the context of child welfare proceedings.  As noted further below, Hawai'i statutes, administrative rules, and historical materials on Native Hawaiian law define the term "hānai" slightly differently.  We do not here decide between these definitions, nor do we limit the applicability of the rule announced herein to relationships factually identical to the relationship between KL and AB.

## A. Family Court Proceedings

### 1. Initiation of Foster Custody

On January 29, 2015, shortly after Mother gave birth to Baby, the Department of Human Services ("DHS" or "Department") initiated protective proceedings with respect to Mother's three children, including AB, by filing a Petition for Temporary Foster Custody. The family court granted temporary foster custody.

### 2. Reunification with Father

AB was unable to live with Father when the Department initiated protective proceedings because Father was living at his parents' home, and his father was a registered sex offender. However, Father began actively looking for housing, and AB and Father had regularly scheduled supervised visits. In accordance with a family service plan, Father engaged in services with the hopes of reunifying with AB.

According to a March 3, 2015 ʻOhana Conference Report, Father and AB had "a strong support in [Father]'s partner, [KL]." Father and KL had been in a relationship for several years, and they had a child together, TL (AB's paternal half-sister). In a June 5, 2015 Safe Family Home Report, the Department stated that AB "asked Father if she can live with him, and she also asked her [paternal] half-sister's mother, [KL], if she can live with her as well." Father and KL began renting a home together in late 2015.

On January 26, 2016, the family court approved the

4

Department's permanency plan to reunify AB with Father, as Father was "continu[ing] to work on services that will assist [him] with reunification."

On March 2, 2016, KL underwent a psychological evaluation to determine her ability to parent AB. KL indicated that she had been involved in AB's life for approximately five years, and that during her periods of separation with Father, KL kept in touch with AB and Mother so that AB and TL could have contact. The Safe Family Home Report dated May 23, 2016 stated, "The evaluation did not find any deficits in [KL's] ability to take care of [AB][.]"

On March 18, 2016, AB was reunified with Father, TL, and KL under an award of Family Supervision, as the Department found, and the court agreed, that Father was able "to provide a minimally safe family home for [AB] at this time with the assistance of a court-ordered service plan."

### 3. SH's First Motion to Intervene

On February 19, 2016, AB's maternal great-aunt, SH, filed a Motion to Intervene. SH argued that she was entitled to intervene pursuant to HFCR Rule 24.[6] SH sought to intervene to

---

[6] HFCR Rule 24 states in relevant part:

Upon timely application anyone shall be permitted to intervene in an action when the applicant claims an interest relating to the . . . custody, visitation, or parental rights of a minor child which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to

(continued...)

ensure that the court was aware of "the concerns of the maternal extended family" and "to give [the] [c]ourt and the Department another placement option[.]" SH claimed that she was "not seeking custody" and "only want[ed] to support [PD's and AB's] fathers and be a second option if necessary[.]" SH noted, however, that she had "submitted the necessary paperwork (which the Department is mandated to consider) necessary to be considered a placement option," and she argued that she "has the legal right to seek custody, should that become necessary, pursuant to [HRS] § 571-46(a)(2)."[7] DHS opposed SH's Motion to Intervene.[8] The court denied the Motion without explaining its reasoning.

### 4. Reinstatement of Foster Custody

On May 20, 2016, the Department submitted a report to

_____

[6](...continued)
protect that interest, unless the applicant['] s interest is adequately represented by existing parties.

[7] HRS § 571-46(a)(2) states that in any proceeding where the custody of a minor child is in dispute, "[c]ustody may be awarded to persons other than the father or mother whenever the award serves the best interest of the child."

[8] On March 22, 2016, the Department filed a memorandum in opposition to SH's motion to intervene, arguing that SH did not have a right or permission to intervene under HFCR Rule 24(a) or (b). The Department argued, "The movant has no right to custody, visitation, nor is she the parent of these children. . . . She has no legal interest. As a matter of fact Movant asserted in her moving papers that she does not want custody."

The Department also argued that SH improperly relied on HRS § 571-46 to support her position. "Movant has asserted that she does not intend to interfere or obtain custody. More importantly this statute section does not apply <u>as these children have never lived with the movant[;] she has never had de facto custody of the children</u>."

the court in advance of the next hearing.  The Department reported that Father and KL "are unsure at this point if they are going to stay together[.]"  The Department noted, however, that both "have agreed to co-parent their daughter and [AB], whatever the outcome.  [KL] has been very loving and involved with [AB], and the girl is bonded with her."  At the time, the Department recommended continuing family supervision.

AB continued to live with KL.  The Department reported that "[AB] is doing well, and bonded with [KL].  [KL] would like to become [AB's] special licensed resource caregiver."[9]  While the Department noted that "Father has had visits with [AB], and helps co-parent her," it changed its recommendation from continued family supervision to foster custody, given Father's new living arrangement - back at home with his father.

After a hearing held on June 2, 2016, the family court placed AB in foster custody and formalized AB's "placement with her hanai relative, [KL]."

Over four months later, on October 17, 2016, the Department reported that Father had "not engaged in services or moved back into the family home since the last hearing held on June 2, 2016."  The Department indicated, "As a result, [AB] is in Foster Custody with the DHS, but was able to remain in [KL]'s care.  [KL] applied for, and qualified to be, a DHS special

---

[9]     17 HAR § 1625 provides for licensing of foster families as "resource caregivers."

licensed resource parent to [AB]. [AB] is very bonded with [KL], who is the mother to [AB]'s half sister, and has known her several years prior to placement."

The Department further reported that since the last review period, Father had minimal contact with KL and DHS, and had not followed through with any recommended services. The report provided, "[AB] has visits with paternal and maternal relatives and enjoys spending time with them. [KL] makes efforts to ensure [AB] has family visits with her relatives" and "has made efforts to encourage Father to see his daughter, but without success."

The report noted that AB's maternal relatives, including her maternal great-aunt, SH, recently visited AB and PD in Hawai'i. "Maternal great aunt has expressed to this worker her concerns for [AB], and has requested to be considered for permanent placement since [Father] has not successfully reunified with his daughter. An [Interstate Compact on Placement of Children (ICPC) study] has been generated by the DHS in order to consider her request."

**5. Termination of Parental Rights, Permanent Plan, and Order Awarding Permanent Custody to the Department**

On November 2, 2016, the Department filed a Motion to Terminate Parental Rights, which was set for hearing on March 10, 2017. Attached to the Motion was a Permanent Plan dated

November 1, 2016.[10]  As outlined in the Plan, the Department's

permanency goal for AB was for "[p]arental rights to be divested

at the next court hearing" and for AB "to be under permanent

placement with DHS by the next court hearing."  In relevant part,

the plan stated:

> **Child's current situation**
> [AB], nine-years-old, is a smart, outgoing and active
> young lady.  She has demonstrated a lot of resiliency
> and is doing very well in her current placement.
> Prior to this placement, she had been living in a DHS
> general licensed resource home with her sister, PD,
> before they were both reunified with their respective
> fathers.  [AB] has bonded with [KL], and considers her
> to be her hanai aunty.  [KL] has a younger daughter by
> [Father], so [AB] is able to live with her half-
> sister, as well.
>
> . . . .
>
> **Connections**
> Besides living with [her paternal half-sister, TL],
> [AB] has visits with [her maternal half-sister, PD],
> as well as other extended maternal and paternal
> family.  [AB] has not had visits with her parents for
> several months due to their lack of contact.
>
> . . . .
>
> <u>Placement</u>
>
> . . . .
>
> **Assessment of the safety of the child's placement:**
> There are no safety indicators in this current
> placement at this time.  A Safety of Placement
> Assessment completed on October 26, 2016, indicates

---

     [10]     Pursuant to HRS § 587-27, the Permanent Plan "is a specific
written plan, prepared by an appropriate authorized agency," that must set
forth information about the plan for the child in foster custody.  Among other
things, the Permanent Plan must include "[a] position as to whether the court
should order an adoption, guardianship, or permanent custody of the child,"
and "[t]he objectives concerning the child, including, but not limited to,
stable placement, education, health, therapy, counseling, birth family . . .
culture, and adoption, guardianship, or preparation for independent living."

this home is safe and appropriate for [AB].

. . .

**Has the current placement been identified as the Child's permanent placement?**
The child's current placement is a possible permanent placement, as [KL] has expressed the desire to adopt [AB].

. . .

**Is the Child's placement stable?**
The placement is considered a stable placement at this time.

. . .

**PERMANENCY PLANNING**

**A. DHS efforts to finalize permanency plan**

. . .

5. Indicate all in-state and out-of-state placement options reviewed and considered.

Maternal family members[11] from the mainland participated in two Ohana Conferences, and were willing or able to provide [AB] a long-term, safe family home. An ICPC has been generated in order to explore this as an option.

. . .

7. Efforts made to include and inform [AB] of the proposed permanent plan or transition plan in a manner that was age-appropriate.

[AB] is very happy in her current placement, and has expressed to DHS that she would like to remain in [KL]'s care.

On February 27, 2017, prior to the hearing on the Department's Motion for Termination of Parental Rights and

---

[11]     This appears to refer to SH and JH.

proposed Permanent Plan, the Department filed a Safe Family Home Report.[12]  The content and tone of this report differed from the November 2016 Permanent Plan in that it emphasized the willingness of AB's maternal great-aunt to adopt her, but did not mention KL's expressed desire to do the same.  This report also failed to mention AB's ties to her half siblings or extended paternal family.  The Department did not explain this shift in focus from KL toward AB's maternal relatives.

On March 10, 2017, the court held a hearing on the Motion to Terminate Parental Rights.  KL attended;[13] Mother and Father did not.  After hearing evidence and argument, the court stated its findings, divested Father and Mother of their parental rights, appointed the Department as permanent custodian of AB, and adopted the terms of the November 2016 Permanent Plan, which appeared to favor placement with KL.  The court dismissed Mother and Father as parties and set a permanency review adoption hearing for August 3, 2017.[14]

---

[12]     The Safe Family Home Report has two parts.  "The first section is the narrative discussion of the information requested by the Safe Family Home Guidelines" set forth in HRS § 587A-27.  DHS Child Welfare Services Procedures Manual § 3.3.  "The second section is a listing of the guidelines as they appear in HRS [§] 587-25."  Id.  The guidelines were originally set forth in § 587-25 but were moved to § 587A-27 in 2010.

[13]     KL had the authority to attend this hearing pursuant to HRS § 587A-14(d), which provides that "[t]he child's current resource family is entitled to participate in the proceedings to provide information to the court, either in person or in writing, concerning the current status of the child in their care."

[14]     It is not clear from the record whether this date was meant to be a hearing on a specific pending adoption petition or merely a permanency hearing required under HRS § 587A-31(a) to be held "every six months [ ] if
(continued...)

11

On April 3, 2017, the court entered its written Order Awarding Permanent Custody, which contained the same findings and conclusions stated in its oral ruling, but also included Finding of Fact G, which stated, "Currently there is no responsible and competent substitute family willing and able to assume the duties of permanent custody of the child[.]"

### 6.    Proposal to Visit New Hampshire

On March 17, 2017, one week after the hearing, the Department submitted a letter to the court proposing that AB visit her relatives in New Hampshire during her summer vacation. The letter requested travel from June 1, 2017 to July 7, 2017, and explained:

> [AB]'s maternal great aunt and uncle, [SH] and [JH], are interested in adopting [AB].  The [Department] would like to allow the child to spend some time with them beforehand, to get better acquainted.  The DHS believes this would help the child and the extended family prepare for this transition before the adoption hearing.  [SH] has agreed to escort [AB] both to and from New Hampshire for this trip.

> If the extended visit goes well, [SH and JH] have agreed to fly back to Hawai'i to attend the adoption hearing, then take [AB] back with them to their home in New Hampshire.  The DHS was awarded Permanent Custody of [AB] on March 10, 2017.

> The adoption hearing is scheduled for August 3, 2017, at 2 p.m.  A home study by the DHS, via an ICPC, was completed on January 18, 2017, which found [SH's] home appropriate for placement.

On March 22, 2017, twelve days after the termination

---

[14](...continued)
the child remains in the permanent custody of the department or an authorized agency."

hearing, the Department submitted a report to the court regarding AB's status.  The report noted that AB's maternal great-aunt, SH, has "continued to express great desire and interest in [AB]'s well-being" and that AB's visit to New Hampshire over summer break will "allow them the opportunity to bond as well as explore possible permanent placement, if all goes well."  The report also noted, however, that KL, "as well as [the father of AB's maternal half-sister, PD], have also expressed interest in adopting [AB].  All of these placements are under consideration by the DHS, and a decision is hoped to be made by the next review hearing."

On April 3, 2017,[15] AB's GAL, Kay Iopa, submitted a status report to the court concerning the Department's travel request.  The GAL stated:

> On March 23, 2017, I reviewed a file stamped travel letter/order.  Said document indicates I was contacted.  That is true.  However, the document omits the fact that I strongly opposed the travel as scheduled.
>
> Further, I also oppose the permanent placement of [AB] in her current foster home.  Repeated efforts have been made to discuss this with DHS, but DHS disregards GAL's concerns.[16]

_____

[15]    The GAL dated the letter and the certificate of service April 4, 2017.  However, the letter was file-stamped by the court on April 3, 2017 at 10:52 a.m.

[16]    This was the first instance in the record in which the GAL directly stated her opposition to AB's permanent placement with KL.  She did not explain why she was opposed.  However, between the November 2016 Permanent Plan, which was favorable to KL, and the GAL's April 2017 opposition to AB's placement with KL, KL had requested respite care for "seven to ten days" due to AB's behavioral challenges.  DHS Case Manager Michelle Starosky denied KL's request and indicated that placing AB with another resource caregiver for that time would be detrimental to her.  Respite care was thus not utilized.  After this incident, DHS "began to look more seriously at the other [placement
(continued...)

It would appear that <u>the Court will need to make appropriate rulings regarding travel and adoption at a contested hearing</u>.

On May 8, 2017, the GAL filed a Motion to Modify Travel Order or Alternatively Advance Adoption Hearing, asking that AB remain in New Hampshire after she arrives, rather than returning to Hawai'i, pending adoption by her maternal extended relatives. In the GAL's declaration, she explained in relevant part:

> 3. [SH] and [JH] . . . have repeatedly told me they want to adopt [AB].
>
> 4. A home study was conducted in January 2017 and [SH and JH's] home was found appropriate for placement;
>
> 5. I am aware that DHS has arranged for [AB] to visit [SH and JH] in New Hampshire for less than 30 days this summer;
>
> 6. As GAL, I find this visit is appropriate as [AB] has never been to New Hampshire and her only contact with [SH and JH] has been during their trips to Hawai'i and by telecommunication;
>
> 7. However, I have grave concerns about the travel schedule which leaves [AB] and [SH and JH] in a state of monthly cross-continental travel and uncertainty; and
>
> 8. Therefore, as GAL, I believe it is in [AB's] best interest to remain in New Hampshire till the August 3, 2017 adoption hearing or advance the adoption hearing to July 7, 2017 when [AB] is scheduled to return to Hawai'i.

---

[16](...continued) options]" for AB.

The GAL's April 2017 report also did not address AB's wishes with respect to the New Hampshire visit or her permanent placement. As of this point, the most recent indication in the record of AB's wishes is in the November 2, 2016 Permanent Plan, which stated: "[AB] . . . has expressed to [DHS] that she would like to remain in [KL]'s care."

14

A hearing on the GAL's motion was scheduled for June 22, 2017.[17] The length of AB's trip to New Hampshire was therefore not entirely settled by the time her trip began on June 11, 2017.

### 7. SH's Second Motion to Intervene

On June 14, 2017, a few days after AB arrived in New Hampshire, SH filed a second Motion to Intervene.[18]

The Department filed a memorandum in opposition to this motion, arguing that SH did not establish that she had a right to intervene pursuant to HFCR Rule 24(a) or permission to do so pursuant to Rule 24(b).[19] After a hearing on June 22, 2017, the

---

[17] The hearing on this motion was held on July 13, 2017.

[18] Citing communication issues with the Deputy AG, SH sought to be a party to ensure "that appropriate coordination and communication may take place and so that [SH and JH] have a representative . . . to advocate for them with regard to this matter." SH argued that she had a right to intervene under Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 24(a)(2) due to her interest in adopting AB. "In light of the fact that the DHS is considering [SH and JH] as adoptive parents for [AB]," SH argued, "they have a cognizable legal interest in the custody of [AB]."

Moreover, SH argued that she and her husband had a right to intervene because of their blood relationship to her. According to SH, if she were "not permitted to intervene at this time," then her "interest in making sure that [AB] is placed in a safe and loving home that is prepared to be a permanent placement may not receive adequate consideration[.]" SH argued that "[d]ecisions regarding placement and/or adoption made without [SH's] input . . . could impair or impede" her ability to protect her interest in adopting AB.

Further, SH argued that she should be considered a "party" to the case pursuant to HRS § 587A-4, which defines a "party" to include "any other person . . . if the court finds that such person's participation is in the best interest of the child." SH argued that allowing her to intervene would be in AB's best interests because it would require the court to decide as soon as possible which home placement is best for AB.

[19] In addition, the memorandum states that "DHS is already addressing [SH]'s concerns. She is being informed of case status, offered phone

(continued...)

15

court denied SH's motion.

### 8.    July 13, 2017 Hearing

On July 13, 2017, the Family Court held a status hearing on the GAL's Motion to Modify Travel Order or Alternatively Advance Adoption Hearing.  Shortly after the hearing began, the GAL and the Department stated that they both now agreed to change AB's foster placement to New Hampshire and continue the adoption hearing.  KL, who was in attendance, then caught the court's attention and indicated she would like to speak.  Over the Department's and GAL's objections, the court allowed KL to provide her input on AB's situation based on KL's status as AB's resource caregiver.

KL presented a statement emphasizing her prominent role in AB's life, "not only as a resource caregiver but as a hanai auntie, stepmom, and mother of her biological paternal half sibling, [TL], who she currently resides with."  KL stated that "[AB] also sees paternal family regularly, aunties, uncles, cousins, as well as my family who have hanaied her as their own." KL went on to say that she felt "as if nobody is looking into [AB's] life here and now and exactly how much she is thriving but instead assuming her life will be better in New Hampshire."  KL asked that the family court "make things pono with this case" and

---

[19](...continued)
visitation and was allowed to have the child for one week while she was on Hawaiʻi Island and it is my belief that the child is having her first visit in [their] home now."

requested "a restraining order be placed on this case to keep things status quo, have [AB] [ ] flown back to Hawaii until this matter gets properly addressed by the court and provide me time to seek adequate legal counsel." She further stated that she "provided for and love[s] [AB] and want[s] to continue to love and provide for [her] through adoption." KL stated:

> [AB] was told, as was I, by [DHS Case Manager Michelle Starosky], that she would be in New Hampshire for a month to allow her time to visit and get to know them, to see if there was a possibility she may want to live there . . . I realized I had been outright lied to, manipulated and suppressed[.]

When KL finished, the family court stated, "Okay. Thank you for that input." The court did not rule on or further acknowledge KL's requests, nor did it orally state any findings or issue any orders.

### 9. July 31, 2017 Order Continuing Permanent Custody and Changing AB's Placement to New Hampshire

On July 31, 2017, the Family Court entered an Order Continuing Permanent Custody, which modified AB's placement from KL's home to the State of New Hampshire, with SH and JH. The Order did not mention KL's requests from the hearing.[20]

---

[20] The Order is somewhat cryptic. It is reproduced here:

/ Under the circumstances that are presented in this case, DHS has made reasonable efforts to finalize the permanency plan which in this case is permanent out of home placement;

| It is in the best interests of the child that the prior award of permanent custody be continued in her new placement located in New Hampshire with [SH and JH];

(continued...)

17

### 10. Petitions for Adoption

On August 21, 2017, the Department filed a Petition for Adoption of AB by SH and JH, FC-A No. 17-1-0029. The hearing was scheduled to take place September 7, 2017.[21]

Previously, on July 13, 2017, KL had filed a pro se petition for non-consent adoption of AB, FC-A No. 17-1-0019. It appears that there was no Notice of Hearing or Certificate of Service with this petition.

### 11. KL's Motion to Intervene

On August 21, 2017, KL, having obtained counsel, filed a Motion to Intervene. KL argued that she had a right to intervene pursuant to HFCR Rule 24(a) and (c). She sought "to protect the best interests of [AB], for whom [KL] has assumed the role of parent and established a bonded relationship, and for whom she was providing a stable and healthy home environment until the abrupt change of placement[.]" She also sought "to

---

[20](...continued)
> __/__ The permanent plan dated November 1, 2016 is in the best interest of the child;
>
> __/__ The present placement is appropriate, safe, and necessary[.]

Although it is unclear, it appears that the family court used proposed findings of fact submitted by the AG's office, marking with slashes those findings it chose not to adopt, and numbering sequentially those it did adopt. Under this reading, the vertical line in front of the second finding above is actually the number 1. If this interpretation is correct, this Order indicates a reversal of the family court's April 3, 2017 adoption of the terms of the November 1, 2016 permanent plan. There is no explanation for this reversal.

[21] The ROA in the instant case refers to the adoption proceedings, but does not include records from them.

protect her own rights as Hanai relative to [AB], and to protect and defend her minor daughter [TL]'s rights as blood sibling to [AB]."

KL stated that she wished to adopt AB, and argued that the Department and GAL's positions were contrary to AB's best interests and based on a "relative preference" that was found impermissible in In re AS, 132 Hawai'i 368, 322 P.3d 263 (2014).

KL requested that the court grant her status to intervene nunc pro tunc to July 13, 2017. KL argued, "Despite the surreptitious and abrupt manner in which the change of placement was brought up, and even without the benefit of counsel, [KL] made a Motion to the Court orally on July 13, seeking to obtain relief on the grounds incorporated in the present Motion," stated in the letter she read aloud at the hearing. Noting that she "asked the [c]ourt to make things pono, maintain the status quo, and allow her time to seek legal counsel" at the July 13 hearing, KL argued that such requests should be construed as a motion to intervene.

The GAL submitted a memorandum in opposition to KL's Motion to Intervene. The GAL argued that KL "urges the [c]ourt to engage in a giant leap of judicial activism" by recognizing KL's right to intervene based on the hānai tradition. She contended that it would "create a whole new right superior of parental rights," that would survive termination of parental rights. As such, the GAL argued that KL "failed to present legal

authority to establish her right to intervene."  The Department also opposed the motion, arguing that KL "has no legal interest" to support a right to intervene, as she has "no right to custody [or] visitation, nor is she the parent of this child."  The Department argued that allowing KL to intervene "may cause delays and prejudice to the remaining parties."

On September 5, 2017, KL submitted a Supplemental Memorandum in Support of Motion to Intervene.  KL argued that she was entitled to challenge the Department's placement of AB in New Hampshire because her interests as a hānai parent[22] constitute "an interest relating to the . . . parental rights of a minor child" under HFCR Rule 24(a)(2).  She also argued that she was entitled to intervene to protect her daughter's inheritance rights, citing HRS §§ 532-4 and -8.

KL argued that it would be in the best interest of AB to add KL as a party, and thus the court should define KL as a "party" under HRS § 587A-4.

### 12.  September 7, 2017 Hearing

On September 7, 2017, the court held a hearing on KL's Motion to Intervene.  After hearing the parties' arguments, the court stated that while KL's counsel "[did] raise issues that the

---

[22]   KL argued that she was a hānai relative as defined in HRS § 587A-4.  In this chapter, part of the Child Protective Act, "hanai relative" is defined as "an adult, other than a blood relative, whom the court or department has found by credible evidence to perform or to have performed a substantial role in the upbringing or material support of a child, as attested to by the written or oral designation of the child or of another person, including other relatives of the child."  As noted previously, KL's hānai status is not in dispute.

court may need to address," it was denying KL's motion based on the reasons set forth in the Department's memorandum in opposition.

### 13. September 18, 2017 Permanent Plan

On September 18, 2017, the Department submitted a new Permanent Plan, which stated the goal of adoption by SH and JH at the next court hearing, scheduled for November 2, 2017.

### 14. KL's Motion for Reconsideration of the Order Denying the Motion to Intervene

The court entered a written order denying KL's Motion to Intervene on October 9, 2017. Thereafter, on October 17, 2017, KL filed a Motion for Reconsideration pursuant to HFCR Rule 59. At a hearing on November 6, 2017, the court addressed KL's Motion for Reconsideration and a few other pending matters.

The court held that because it had already consolidated the competing adoption petitions and allowed the parties to access the documents from the original child welfare case, the motion to reconsider was moot. The court filed a written order denying the motion on December 21, 2017, and KL timely appealed.

The adoption evidentiary hearing was scheduled for January 29, 2018.

### 15. Mandamus Petition

On December 15, 2017, KL filed a petition for writ of

21

mandamus to this court.[23]  This court denied mandamus relief.

**B.   ICA Proceedings**

**1.   Opening Brief**

On appeal, KL challenged: (1) the Order Awarding Permanent Custody, entered April 3, 2017; (2) the Order Continuing Permanent Custody, entered July 31, 2017;[24] (3) the Order Denying Motion to Intervene entered October 9, 2017; and (4) the Order Denying Motion for Reconsideration of Order Denying Motion to Intervene entered October 9, 2017, entered December 21, 2017.

Regarding the April 3 Order Awarding Permanent Custody, KL challenged Finding of Fact G - "Currently there is no responsible and competent substitute family willing and able to assume the duties of permanent custody of the child" - as plain error.  KL argued that pursuant to HRS § 587A-33(a), "the court was required to find by clear and convincing evidence that the proposed Permanent Plan is in the best interest of the child, and to presume that it was in the child's best interest to be

---

[23]   KL sought an order directing Judge Nagata to (1) grant her August 21, 2017 Motion to Intervene in FC-S No. 15-0007 <u>nunc pro tunc</u> to July 13, 2017 (the date of the change of placement hearing); (2) grant her August 21, 2017 Motion for an Emergency Change of Placement; (3) release to her the complete transcripts of the proceedings held on September 7, 2017, November 2, 2017, and November 6, 2017 in FC-S- No. 15-0007; (4) vacate the April 3, 2017 Order Awarding Permanent Custody of AB to DHS; and (5) recuse herself from further presiding over FC-S No. 15-0007, FC-A No. 17-0019, and FC-A No. 17-0029.

[24]   KL argued that she did not discover the errors from (1) the Order Awarding Permanent Custody and (2) the Order Continuing Permanent Custody until after her Motion to Intervene and Motion for Reconsideration were denied.

permanently placed with responsible and competent substitute parents in a safe and secure home."  While Finding of Fact G stated that there was no suitable substitute family, no evidence was introduced to support that finding.

Regarding the Order Continuing Permanent Custody, KL challenged the Finding of Fact that "[i]t is in the best interest of the child that the prior award of permanent custody be continued in her new placement located in New Hampshire" as plain error.  KL argued that pursuant to HRS § 587A-31(c), the court must make written findings including, among other things, "(2) [w]hether the current placement of the child continues to be appropriate and in the best interests of the child or if another in-state or out-of-state placement should be considered[.]"  The court concluded that placing AB in New Hampshire would be in her best interests without first "addressing whether the current placement with [KL] continued to be appropriate."  Thus, KL argued, the court's failure to state its findings regarding AB's current placement at the time was plain error.

Moreover, KL argued that under In re AS, 132 Hawaiʻi 368, 322 P.3d 263, the court "is the final arbiter of whether a proposed change in placement is in the best interests of a minor," and the court should reject the Department's placement decision "if it is shown by a preponderance of the evidence that the change of placement is not in the child's best interests."  KL contends that she "had a right to dispute the Department's

23

proposed change of placement, and the [c]ourt was required to make an independent determination of the matter."  According to KL, "[t]he failure of the [c]ourt to make an independent determination before adopting the Department's recommendation was plain error."

Furthermore, KL argued that the Department's recognition of KL as AB's hānai mother "granted her legal status as AB's relative, and her home as AB's family home."  She argued that this recognition conferred a benefit to KL, AB, and TL "by recognizing their traditional Hawaiian 'Ohana as a family," and thus the Department was required to give them "a fair opportunity to be heard and a fair process by which it would be determined that their family would be broken up against their will, before taking action to separate them."  In support of this due process argument, KL cited Morrissey v. Brewer, 408 U.S. 471, 481 (1982), Goldberg v. Kelly, 397 U.S. 254 (1970), and Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Regarding the Order Denying Motion to Intervene, KL argued that the court erred by denying this motion based on lack of standing, rather than addressing the merits of her challenge to the Department's placement decision.  She contended that the court "adopted the Department's argument that [KL] was merely a former resource care-giver without an interest in the case, overlooking the nunc pro tunc character of the Motion to Intervene."  KL also claimed that "the record itself is clear"

24

that KL indeed had standing, because at the July 13, 2017 hearing, the court "already ruled that [KL] did have standing[.]"

Regarding the Order Denying Motion for Reconsideration, KL argued that the family court erred in ruling that her challenge in the instant case was moot due to consolidation of the competing adoption petitions.  KL argued that if she "were to have overturned the Department's choice, and regained custody of AB, then under HRS § 578(2)(a)(6), her consent would be required to any proposed adoption of AB, which in the present circumstances would allow her to withhold consent to the New Hampshire adoption."

### 2.  Answering Brief

In its Answering Brief, the Department argued KL lacked standing to challenge (1) the Order Awarding Permanent Custody and (2) the Order Continuing Permanent Custody, as she was "neither a parent, nor a party to [AB]'s custody proceeding" and was thus not "affected or prejudiced by the appealable order." The Department argued that while the court allowed KL to participate in the July 13, 2017 hearing as AB's resource caregiver, the transcript "is clear that the family court did not determine that [KL] had standing to contest custody."

Moreover, the Department argued that even if KL had standing, her appeal of the custody orders was untimely under Rule 3 of the Rules Expediting Child Protective Appeals (RECPA),

25

and HRAP Rule 4.[25]  Citing the 30-day window to file a notice of appeal, the Department noted that KL's appeal was filed 277 days after the Order Awarding Permanent Custody was ordered and 158 days after the Order Continuing Permanent Custody was ordered. Because "[t]here is no statutory exception allowing for such late filings," the Department argued that the ICA should not address the merits of these two appeals.

The Department also argued that KL's points lack merit. Regarding the Order Awarding Permanent Custody, the Department contended that Finding G was harmless error pursuant to HFCR Rule 61[26] because such a finding "is not a statutory requirement in an order terminating parental rights and awarding permanent custody to the DHS[.]"

With regard to KL's claim that the Department conferred a benefit by recognizing her as the hānai parent of AB, the Department asserted that this argument was not raised at the March 10, 2017 hearing on the termination of parental rights and,

---

[25]     Although the Department did not cite it, the statute giving authority for HRAP Rule 4 is HRS § 641-1.

[26]     HFCR Rule 61 provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

in any event, such an argument does not have a legal basis.

The Department also argued that KL "fails to substantiate the claim that she has a de facto right to custody of [AB] as a contracted resource parent." The Department noted that "[a]s a resource caregiver, [KL] had a contractual relationship with the DHS to care for the child," which is not the same thing as "custody of the Child." The Department contended that because "[f]oster custody and permanent custody of [AB] was with the DHS," KL did not have de facto custody of AB pursuant to HRS § 571-46(a)(2).

Finally, the Department argued that it was not a manifest abuse of discretion to deny KL's Motion for Reconsideration, as KL did not present any new evidence, and the matters raised in the motion had already been addressed by the court. Moreover, the Department asserted that the court properly deemed the motion to reconsider unnecessary once it consolidated the competing petitions for adoption.

3. **Reply Brief**

In her Reply Brief, KL again asserted that the court recognized that she had standing at the July 13, 2017 hearing. She contended that the Department failed to support its claim that the trial court satisfied its duty to hold a hearing and make independent recommendations before changing AB's placement, and that "the Department avoided answering the question of whether [KL] was entitled to a contested hearing before the

27

change of placement, when it was properly before the court."

KL also asserted that the Motion for Reconsideration presented newly discovered evidence, and that her efforts to contest the change of placement in the original child protection proceeding were not moot.

Regarding the claim that Finding G in the Order Awarding Permanent Custody was harmless error, KL contends that HRS § 587A-33 "does require the court to make that determination, and the Department does not show why that section of the statute should be ignored."

Additionally, with regard to the Order Continuing Permanent Custody, KL raised the new argument that in addition to "ma[king] no finding as to whether AB's placement with [KL] continued to be appropriate[,]" this Order improperly "contains, side by side, two contradictory findings[.]"  KL asserted that the court's finding that it was in AB's best interests to continue the "new placement in New Hampshire with [SH and JH]" contradicted the other finding that "[t]he present placement is appropriate, safe, and necessary," given that the "present placement" was with KL.

### 4.  ICA Summary Disposition Order

On November 30, 2018, the ICA entered its Summary Disposition Order (SDO).  The ICA held that it lacked appellate jurisdiction over the appeal of the April 3, 2017 Order Awarding Permanent Custody and the July 31, 2017 Order Continuing

28

Permanent Custody, due to untimeliness.  The ICA determined that

the Order Awarding Permanent Custody was immediately appealable,

citing In re Doe, 77 Hawaiʻi 109, 114-15, 883 P.2d 30, 35-36

(1994), and thus an appeal should have been filed within 30 days

of its entry.  The ICA determined the same with regard to the

Order Continuing Permanent Custody.  Because neither order had

been appealed within the 30-day window set by HRAP Rule 4

pursuant to HRS § 641-1, the ICA held that it lacked appellate

jurisdiction over them.

The ICA also determined that even if these appeals were

timely filed, KL would lack standing to bring such a challenge:

> When the Order Awarding Custody was entered, KL was
> not a party and had not sought to intervene in this
> proceeding for termination of parental rights.  KL
> lacks standing to enforce the parental rights of AB's
> mother [ ] or father [ ].  In re F Children, Nos.
> 2882, 2883, and 1884, 2009 WL 1300933 (Haw. App. May
> 9, 2009) (mem. op.) at *8 (Father lacks standing to
> enforce Mother's parental rights).  Mother and Father
> did not appeal the termination of their parental
> rights to AB.  Therefore, the termination of their
> parental rights is final.

With regard to the Order Denying Motion to Intervene,

the ICA rejected KL's arguments that the Family Court erred in

not recognizing her standing at the September 7, 2017 hearing,

and that it had previously recognized her standing as a party at

the July 13, 2017 hearing.  The ICA determined that the Family

Court allowed KL to speak at the July 13, 2017 hearing because

she was AB's resource caregiver, which was consistent with HRS §

587A-14(d) (2006).  The ICA noted that "[t]he Family Court made

29

no finding at the July 13, 2017 hearing that it was in AB's best interest to allow KL to participate in this termination proceeding as a party or a person with standing to be a party." The ICA also determined that "contrary to KL's argument on appeal, KL did not and could not have orally requested to intervene during that hearing because a motion to intervene under HFCR Rule 24(c) must be made in writing."

Nevertheless, the ICA agreed that KL's Motion to Intervene and Motion for Reconsideration should have been granted on the basis of KL's submission of a petition to adopt AB. The ICA reasoned as follows:

> HFCR Rule 24(a)(2) requires a family court to permit intervention by anyone who claims an interest in the custody or visitation of the subject minor child when the applicant is "so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest[.]" We conclude that, upon the post-termination submission of a petition for adoption of a minor child, the adoption petitioner is claiming an interest in the custody or visitation of the child and is so situated that the disposition of the placement issues in the termination of parental rights action may, as a practical matter, impair or impede the adoption petitioner's ability to protect that interest. It cannot be ignored that, as a practical matter, post-termination placement decisions can impact adoption proceedings in a variety of ways. That is not to say that the adoption petitioner's interest must be given particular weight, but such petitioners should be permitted to intervene, post-termination, to ensure that their interests are adequately protected.

The ICA recognized that "[h]ere, if at the time the family court denied KL's motion to intervene, there was a pending petition for adoption filed on behalf of KL, then the Family

30

Court erred in denying the motion to intervene." The ICA noted the same with regard to SH and JH: "the Family Court also denied a post-termination motion to intervene filed by SH and JH. If at the time the Family Court denied that motion, a petition for adoption on behalf of SH and JH was pending, then the Family Court also erred in denying that motion."

The ICA disagreed, however, with KL's contention that the family court should have necessarily granted the Motion to Intervene nunc pro tunc. The ICA noted that KL did not cite authority for this proposition, and the ICA found none. The ICA also held that because KL did not file a written motion to intervene on July 13, 2017, she was not entitled to have her status as a party be retroactive to that date.

Finally, with regard to the Order Denying the Motion for Reconsideration, the ICA addressed KL's argument that the family court incorrectly considered her arguments moot upon consolidating the two adoption petitions. Specifically, the ICA considered KL's argument that, if she were permitted to intervene and then were able to "overturn[] the DHS's choice of resource caregiver placement" and "regain custody of AB, then KL's consent would have been required for any proposed adoption of AB[.]"

The ICA held that KL's consent to adoption would not be required under HRS § 578-2(a) even if AB were returned to her care. The ICA cited HRS § 578-2(a):

> (a) Persons required to consent to adoption. Unless
> consent is not required or is dispensed with under

31

subsection (c) hereof, a petition to adopt a child may be granted only if written consent to the proposed adoption has been executed by:

(1) The mother of the child;

(2) A legal father as to whom the child is a legitimate child;

(3) An adjudicated father whose relationship to the child has been determined by a court;

(4) A presumed father under section 578-2(d);

(5) A concerned natural father who is not the legal, adjudicated, or presumed father but who has demonstrated a reasonable degree of interest, concern or responsibility as to the welfare of a child . . .;

(6) Any person or agency having legal custody of the child or legally empowered to consent;

(7) The court having jurisdiction of the custody of the child, if the legal guardian or legal custodian of the person of the child is not empowered to consent to adoption;

(8) The child to be adopted if more than ten years of age, unless the court in the best interest of the child dispenses with the child's consent.

According to the ICA, even if KL resumed foster custody of AB, this would not constitute <u>legal</u> custody of AB such that HRS § 578-2(a)(6) would apply.  The ICA referred to the definition of "legal custody" under HRS § 571-2[27] and the

_____

[27]    HRS § 571-2 states:

"Legal custody" means the relationship created by the court's decree which imposes on the custodian the responsibility of physical possession of the minor and the duty to protect, train, and discipline the minor and to provide the minor with food, shelter, education, and ordinary medical care, all subject to residual parental rights and responsibilities and the rights and responsibilities of any legally appointed

(continued...)

32

definition of "foster custody" under HRS § 587A-4.[28]  The ICA recognized that the Department was appointed "as the permanent custodian, with the duty to provide food, clothing, shelter, psychological care, physical care, medical care, supervision, other necessities, and appropriate education to AB."  As such, the ICA held, "DHS, not KL, had legal custody of AB and could provide consent to an adoption under HRS § 578-2(a)(6).

The ICA noted that KL presented no other argument on appeal that the family court abused its discretion in denying the Motion for Reconsideration.  Nevertheless, the ICA clarified that, "as stated above, if a post-termination petition for adoption filed on behalf of KL was pending, then the Family Court erred in declining to permit KL to intervene."

The ICA concluded as follows:

> For these reasons, KL's appeal is dismissed in part for lack of appellate jurisdiction with respect to the Family Court's April 3, 2017 Order Awarding Permanent Custody and the July 31, 2017 Order Continuing Permanent Custody.  The Family Court's October 9, 2017 Order Denying Intervention and December 21, 2017 Order Denying Reconsideration are vacated.  Recognizing,

---

[27](...continued)
    guardian of the person.

[28]    HRS § 587A-4 states:

"Foster custody" means the legal status created when the department places a child outside of the family home with the agreement of the legal custodian or pursuant to court order, after the court has determined that the child's family is not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan.

however, that AB's circumstances may have changed and the issue of intervention in this termination proceeding may be moot, we remand this case to the Family Court for such further proceedings as may be necessary.

After the SDO was entered, KL filed a Motion for Reconsideration, which was denied.

## C.    Certiorari Proceedings

KL timely filed an application for certiorari, which raises the following questions:

1.    Did Petitioner's status as Hanai mother of AB and head of a Hawaiian Ohana confer substantive family rights that could not be abrogated without a due process fair hearing with an opportunity to be heard, as was requested by Petitioner in Family Court on July 13, 2017, speaking as "an educated Hawaiian, a mother, a resource caregiver, a registered nurse and the biological parent of AB's biological sibling"?[29]

2.    What is the minimum showing/quantum of evidence sufficient to require a contested hearing on the proposed change of placement pursuant to In the Interest of A.S., 132 H. 368, 322 P.3d 263 (2014), and did Petitioner's July 13, 2017, request for a contested hearing meet that standard?

3.    Should this Court apply Rule 2, H.R.A.P., to reach Petitioner's claims of plain error in the Order Awarding Permanent Custody entered on April 3, 2017 and the Order Continuing Permanent Custody entered on July 31, 2017, by which Petitioner's & her daughter's family rights were adversely affected, when Petitioner was present at the court hearings, but was not a party and did not receive copies of the Orders until long after the time to file a Notice of Appeal had lapsed?

_____

    [29]    The quoted language is from KL's statement to the family court on July 13, 2017.

34

4.    Was the Family Court's Finding of Fact G in the Order Awarding Permanent Custody, that there was "no responsible and competent substitute family willing and able to assume the duties of permanent custody" clearly erroneous, and if so, was the Order Awarding Permanent Custody invalid?

5.    Was the Family Court's Finding of Fact in the Order Continuing Permanent Custody that "the present placement is appropriate, safe, and necessary" inconsistent with its change of placement to New Hampshire in the same Order, and if so, was the change of placement clearly erroneous?

6.    Was Petitioner entitled to have her Motion to Intervene, which was filed on August 21, 2017, relate back to July 13, 2017, the day that Petitioner made her oral Motion to the Court, when Petitioner was acting pro se, and actually had her Motion written out and read from it to the Court?

Oral argument was held on June 20, 2019.  On June 28, 2019, this court issued an order vacating the family court's July 13, 2017 order changing AB's placement to New Hampshire.  We ordered that the family court conduct a contested placement hearing, "giving proper recognition to KL's status as a hānai parent, as well as AB's best interests."  We retained concurrent jurisdiction to enter an opinion and judgment to follow the order.

### III.  STANDARDS OF REVIEW

In reviewing family court cases, we recognize the following standards.

35

## A.    Family Court Decisions

In <u>Fisher v. Fisher</u>, we held:

> Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) (quoting <u>In re Doe</u>, 95 Hawaiʻi 183, 189-90, 20 P.3d 616, 622-23 (2001)).

## B.    Findings of Fact, and Conclusions of Law

On appeal, we review the family court's findings of fact

> under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.
>
> On the other hand, the family court's COLs are reviewed on appeal de novo, under the right/wrong standard. COLs, consequently, are "not binding upon an appellate court and are freely reviewable for their correctness.
>
> ....
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

<u>Id.</u> (quoting <u>In re Doe</u>, 95 Hawaiʻi at 190, 20 P.3d at 623).

## IV. DISCUSSION

### A. Jurisdiction

This court has jurisdiction to review the October 9, 2017 Order Denying Motion to Intervene and the December 21, 2017 Order Denying Motion for Reconsideration. In substance, those orders related back to the July 31, 2017 Order Continuing Permanent Custody.

HRS § 587A-36, which governs appeals of family court orders, provides: "[a]n interested party aggrieved by any order or decree of the court under this chapter may appeal as provided in section 571-54." Under HRS § 571-54:

> An interested party, aggrieved by any order or decree of the court, may appeal to the intermediate appellate court for review of questions of law and fact upon the same terms and conditions as in other cases in the circuit court, and review shall be governed by chapter 602, except as hereinafter provided. Where the decree or order affects the custody of a child or minor, the appeal shall be heard at the earliest practicable time.

Chapter 602, in turn, gives this court jurisdiction "[t]o hear and determine all questions of law, or of mixed law and fact, which are properly brought before it by application for a writ of certiorari to the intermediate appellate court or by transfer as provided in this chapter." HRS § 602-5(a)(1).

KL did not timely appeal the family court's orders granting and continuing permanent custody, entered on March 13, 2017 and July 31, 2017. The ICA dismissed the appeal in part

37

because of this defect.[30]  But KL <u>did</u> timely appeal the family
court's decision on her Motion for Reconsideration of its order
denying her Motion to Intervene.[31]

Because the Motion for Reconsideration raised the same
set of issues KL raised in her earlier opposition to the July 31,
2017 Order Continuing Permanent Custody, we conclude that KL
timely appealed the relevant issues from the July 31, 2017 Order.

## B.   KL Had A Right to Intervene in the Case Under HFCR Rule 24(a)(2)

Pursuant to HFCR Rule 24(a)(2):

> Upon timely application anyone shall be permitted to
> intervene in an action when the applicant <u>claims an
> interest relating to the . . . custody, visitation, or
> parental rights of a minor child</u> which is the subject
> of the action and the applicant is so situated that
> the disposition of the action may as a practical
> matter impair or impede the applicant's ability to
> protect that interest, unless the applicant['s]
> interest is adequately represented by existing
> parties.

HFCR Rule 24(a)(2) (emphasis added).

Here, KL's statement to the family court on July 13,
2018 was sufficient to alert the court that she wished to
intervene based on her interest in the custody, visitation, or
parental rights of AB.  Her interest was based on several aspects

---

[30]   The ICA stated that an untimely appeal is "a jurisdictional defect
that cannot be waived by the parties or disregarded by the court."

[31]   The family court entered its order denying KL's Motion for
Reconsideration on December 21, 2017; KL filed her notice of appeal on
January 5, 2018.  Pursuant to HRAP Rule 4(a)(3), the timely filing of the
Motion for Reconsideration extended the time for appeal of the October 9, 2017
Order Denying Motion to Intervene until 30 days after the entry of the order
disposing of the Motion for Reconsideration.

of her role in AB's life: a hānai relative currently raising AB, the mother of AB's half-sister, and AB's resource caregiver, as well as being a petitioner to adopt AB.  Taken together, these facts clearly show that KL's interest was sufficient to allow her to intervene under HFCR Rule 24(a)(2).

### 1.   KL's Motion to Intervene Did Not Need to Be in Writing

The fact that KL did not move to intervene in writing, which the ICA found dispositive, is not relevant.  First, HFCR Rule 24 requires only an "application," not a motion. Consequently, HFCR Rule 10(a), which requires that all motions - except when made during a hearing or trial - be in writing does not apply in its plain terms.[32]  Even if HFCR Rule 10(a) did apply to applications to intervene, KL requested an opportunity to notify the court of her interest in the proceeding during a hearing.  Consequently, even if construed as a motion, rather than an application, this motion would be exempt from the writing requirement under HFCR Rule 10(a).

### 2.   The Family Court Should Have Construed KL's Statement as a Motion to Intervene

Although KL's statement was not framed as an application to intervene in the proceedings, the family court should have construed it as such.  At that time, KL was acting pro se.  It is well settled that courts should avoid construing

---

[32]     HFCR Rule 10(a) states, "All motions, except when made during a hearing or trial, shall be in writing, shall state the grounds therefor, shall set forth the relief or order sought, and if involving a question of law shall be accompanied by a memorandum in support of the motion."

pro se pleadings "technically" in a way that forecloses a path to relief that might otherwise be available.  See Waltrip v. TS Enters., Inc., 140 Hawai'i 226, 231, 389 P.3d 815, 820 (2016) ("[P]leadings and letters in administrative proceedings are to be construed liberally rather than technically." (citations and alteration omitted)); see also Ryan v. Herzog, 142 Hawai'i 278, 418 P.3d 619 (2018) ("The rules do not require technical exactness or draw refined inferences against the pleader; rather, they require a determined effort to understand what the pleader is attempting to set forth and to construe the pleading in his favor." (quoting Dupree v. Hiraga, 121 Hawai'i 297, 314, 219 P.3d 1084, 1101 (2009))).  It was clear from the substance of KL's statement that she was asking to assert her interest in the proceeding.  The family court should have recognized that and construed KL's statement as an application to intervene.

**3.  The Family Court Should Have Considered KL's Hānai Status as A Factor Weighing in Favor of Granting Intervention**

On appeal, the ICA correctly held that, given KL's pending adoption petition, she had a sufficient interest to warrant intervention in the child welfare proceeding.  However, it erred when it did not recognize that, in addition, by virtue of her status as the current resource caregiver, a hānai relative presently raising AB, and the mother of AB's half-sister, KL had a right to intervene in the proceeding.

In the aggregate, the roles KL played in AB's life were

sufficient to confer a right to intervene in the child welfare case.  When determining whether a person has asserted an interest sufficient to intervene in child welfare proceedings, we hold that the family court must consider any asserted hānai relationships as a factor weighing in favor of intervention.

Hānai relationships are rooted in Native Hawaiian culture:

> Meaning "to feed" or "to nourish," hānai refers to a child who is reared, educated, and loved by someone other than the child's natural parents.  Traditionally, kūpuna and older siblings within the family exercised the right to hānai.  The purpose of hānai was often to fill an emotional void for those without children in the home or to solidify a relationship between two families.
>
> . . .
>
> Traditionally, natural parents renounced all claims to a child in "a binding agreement when the parents said in the hearing of others, 'Nāu ke keiki kūkae a naʻau,'" meaning "I give this child, intestines, contents and all."  Thus, the permanent quality of the hānai relationship made it a near equivalent of legal adoption.  It is important to note, however, that the permanency of hānai was never intended to sever the child's genealogical heritage.

Native Hawaiian Law: A Treatise 1140-41 (Melody Kapilialoha MacKenzie with Susan K. Serrano, D. Kapuaʻala Sproat, eds., 2015) (citations omitted).

Several statutes define and incorporate the concept of hānai relationships into state law.  The term is defined in the Child Protective Act as:

> [A]n adult, other than a blood relative, whom the court or department has found by credible evidence to perform or to have performed a substantial role in the

41

> upbringing or material support of a child, as attested
> to by the written or oral designation of the child or
> of another person, including other relatives of the
> child.

HRS § 587A-4.

Hawaiʻi's administrative rules governing Temporary Assistance of Needy Families defines "relatives" to include hānai mothers and fathers.[33]  HAR § 17-656.1-7(b)(1).  The section includes that "'[h]anai' means a child who is taken permanently to be reared, educated, and loved by someone other than the child's natural parents at the time of the child's birth or in early childhood.  The child is given outright, and the natural parents renounce all claims to the child."  HAR § 17-656.1-2. And in Hawaiʻi's Workers Compensation Law, the term "child" includes "a hanai child acknowledged prior to the personal injury."  HRS § 386-2.  This section does not define the term "hānai."

This court has also recognized the legal significance of hānai relationships.  In Leong v. Takasaki, 55 Haw. 398, 520 P.2d 758 (1974), we considered whether a minor child could recover damages for negligent infliction of emotional distress after he witnessed his hānai grandmother killed in a car

---

[33]     Many other administrative rules also recognize hānai relationships.  See, e.g., HAR §§ 17-2030-2 (Hawaiʻi Public Housing Authority administrative rules defining hānai child as "a person, under nineteen years of age, for whom an applicant provides food, nourishment, and support and who is known among friends, relatives, and the community as the applicant's child"); 17-656.1-15(c)(3) (Aid to Families with Dependent Children rule that "[t]he needs and income of hanai parents must be included in assistance units which include a hanai child").

accident. We found that the absence of a blood relationship did not bar the child's recovery, citing the strong Native Hawaiian tradition of hānai.[34] 55 Haw. at 410-11, 520 P.2d at 766. Our holding that the family court must weigh hānai relationships in favor of granting intervention in a child welfare proceeding recognizes the emotional bond between hānai parent and child. This bond confers an interest on behalf of the parent in the life of the child, even without formal adoption.

**C.  The Family Court Erred When it Failed to Examine the Best Interests of the Child Before Ordering Out of State Placement**

**1.  DHS Has Broad Discretion to Recommend In-State Placement of Foster Children**

"[U]pon termination of parental rights, discretion to determine an appropriate custodian is vested in DHS." In re Doe (December 2002 Doe), 100 Hawaiʻi 335, 346, 60 P.3d 285, 296 (2002). One of the statutory "duties and rights" of DHS, as permanent custodian, is "[d]etermining where and with whom the child shall live; provided that the child shall not be placed outside the State without prior order of the court[.]" HRS § 587A-15(d)(2). When DHS recommends an in-state placement, we have recognized that DHS "must necessarily be free as an agency, with its particular expertise in child welfare, to make choices among living arrangements[.]" In re AS, 132 Hawaiʻi 368, 378,

---

[34]     At the same time, this court has stopped short of using the doctrine of equitable adoption to make hānai children heirs of their hānai parents. Maui Land & Pineapple Co. v. Naiapaakai Heirs of Makeelani, 69 Haw. 565, 568, 751 P.2d 1020, 1021-22 (1988). Our decision today follows Leong but does not disturb the holding in Maui Land & Pineapple.

322 P.3d 263, 273 (2014).

In defining the parameters of the family court's review of an in-state placement decision, we found that "where a party challenges DHS's permanent placement determination, that party bears the burden of proving, by a preponderance of the evidence, that DHS's permanent placement determination is not in the best interests of the child." Id. at 377. We set forth this rule because DHS's "social workers are presumed to be experts on child protection and child welfare." Id. (citing HRS § 326-51 (1993 & Supp. 2008), and HRS § 587A-19 (Supp. 2010)). Under this standard, DHS's in-state permanent placement recommendation will be upheld unless "the party contesting DHS's permanent placement recommendation" establishes by a preponderance of the evidence that the recommended placement is not in the child's best interests. Id.

**2. The Family Court's Best Interests of the Child Determination Limits DHS's Discretion Where DHS Recommends Out-Of-State Placement**

Where DHS recommends an out-of-state permanent placement, "the child shall not be placed outside the State without prior order of the court," HRS § 587A-15(d)(2), regardless of whether this placement recommendation is contested by another party. In In re AS, we held that the family court must make its own best interests determination in the context of permanency hearings. 132 Hawaiʻi at 377, 322 P.3d at 272. Similarly, in AB's case, the family court had an obligation in

44

all instances involving out-of-state permanent placement recommendations to conduct an independent determination of the child's best interests.

The family court did not conduct such a determination. At the July 13, 2017 hearing, the court accepted, without any serious inquiry into AB's best interests, the recommendation to change AB's placement to New Hampshire.[35] The extent of the court's inquiry is reflected in the transcript between the court, the GAL, and Deputy Attorney General Sandra Freitas, appearing on behalf of the Department, as follows:

> THE COURT: Thank you. Good morning. Please have a seat, everyone. So, Miss Iopa, this is a status hearing on your motion. Where are we at?
>
> MS. IOPA: Yes, Your Honor. I believe we have an agreement for a change of placement and to continue the adoption hearing.
>
> THE COURT: Ms. Freitas?
>
> MS. FREITAS: That is correct, Your Honor. The Department is going to be changing the placement of the child to [SH and JH's] home on the mainland.
>
> THE COURT: All right.
>
> MS. FREITAS: She's been there.
>
> THE COURT: And that's where she is at now?
>
> MS. FREITAS: Things have been going well. Yes. And the ICPC already went through approving that home. So effective today, we're going to be having the status changed, so that will be the resource home.

---

[35] It is also unclear whether the family court considered this court's holding that "there is no relative placement preference in [HRS] chapter 587A [] with respect to permanent placement of foster children[.]" In re AS, 132 Hawai'i at 370, 322 P.3d at 265.

THE COURT: All right.

The family court did not inquire into DHS's abrupt change of position in favor of SH. It did not ask the GAL what AB's position was with regard to her permanent placement. It did not consider how this change of placement would impact AB's relationships in Hawai'i, or how it would impact AB's interests in stability. It did not ask why possible permanent placement options in Hawai'i, including her present placement at the time, were no longer being considered. The court simply said, "All right" and moved on. Considering the record before the family court at that time, and considering the family court's statutory obligation to review the DHS's out-of-state placement decision, this was an abuse of discretion.

We have recognized that "[w]here the best interests of a child is of paramount importance, consideration of all relevant evidence becomes a critical duty of the court in making a decision regarding custody and visitation." In re Doe (2006 Doe), 109 Hawai'i 399, 411, 126 P.3d 1086, 1098 (2006) (citations omitted). As such, we held that the family court abused its discretion when it denied appellants "the opportunity to present evidence to show that visitation was in the best interest of the children," and we ordered that the appellants be provided this opportunity on remand. Id.

KL likewise was wrongfully denied the opportunity to present evidence to the family court regarding AB's placement.

46

The court allowed KL's statement at the July 2017 hearing, not because of her interests in AB's custody, but because of her statutory right, as the current resource caregiver, to "participate in the proceedings to provide information to the court . . . concerning the current status of the child in [her] care."  See HRS § 587A-14.  The opportunity to read a statement aloud does not satisfy the 2006 Doe requirement.  Rather, KL should have been able to participate as a party and thereby present evidence and otherwise develop an adequate factual record for the court's consideration.

Moreover, there is no indication that the family court considered KL's statement when issuing its decision.  Aside from stating, "Thanks for that input," the court did not address KL's assertions, acknowledge the dispute regarding whether AB's proposed out-of-state placement was in her best interests, or even state a finding that such a change was in AB's best interests.

3.    **The Family Court Should Have Considered AB's Hānai Relationship with KL When it Determined AB's Best Interests**

HRS § 571-46(b) sets forth the factors involved in a best interests of the child analysis in the context of child custody and visitation determinations in divorce proceedings. Among these are "[t]he emotional needs of the child," "[t]he child's need for relationships with siblings," and "[t]he overall quality of the parent-child relationship."  In addition, "[o]ther

factors for consideration may include the child's own desires and his [or her] emotional and physical needs." In re Doe, 95 Hawaiʻi at 191, 20 P.3d at 624 (quoting Woodruff v. Keale, 64 Haw. 85, 99-100, 637 P.2d 760, 769-70 (1981)). Hānai relationships fit within these categories that the family court must consider in determining a child's best interests.

Given the significance of the hānai relationship in our statutes, prior case law, and Native Hawaiian history, as stated above, such relationships are an essential part of the best interests of the child determination. Consequently, we hold that family courts must consider these relationships whenever the statute requires that the court determine the best interests of a child. Because the family court did not consider AB's hānai relationships, including her relationship with KL, it abused its discretion in changing AB's placement to New Hampshire.[36]

Because we find that KL was entitled to intervene in the proceedings under HFCR Rule 24(a) and that the family court inadequately considered AB's best interests in changing her placement on July 13, 2017, we need not reach the constitutional question posed in KL's first point of error on certiorari. In addition, we do not determine here whether the family court erred in its Findings of Fact on March 13, 2017 - this question is moot because the family court must now make new findings of AB's best

---

[36] It also does not appear that the family court took into account HRS § 571-46(b)(10)'s mandate to consider AB's "need for [a] relationship with her sibling[]," TL, who also resided with KL while AB was in KL's home.

interests with KL as a party to the proceeding.[37]

## V.   CONCLUSION

For the reasons set forth above, and consistent with our June 28, 2019 Order, we vacate the January 31, 2019 judgment of the ICA and the July 31, 2017 order of the family court and remand for further proceedings consistent with this opinion.

| | |
|---|---|
| Peter L. Steinberg<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Ian T. Tsuda, Julio C.<br>Herrera, Kurt J. Shimamoto,<br>and Patrick A. Pascual | /s/ Sabrina S. McKenna |
| (Sandra L.S. Freitas<br>and Julio C. Herrera | /s/ Richard W. Pollack |
| on the brief)<br>for respondent | /s/ Michael D. Wilson |



---

[37]   We also need not decide whether KL qualified as a person with "de facto custody" of AB pursuant to HRS § 571-46(a)(2).  Should the family court determine that KL had de facto custody of AB, that status may confer additional rights in the pending adoption proceeding.